[Civ. No. 8058.   Third Dist.   June 23, 1951.]

BOARD OF SUPERVISORS OF PLACER COUNTY et al., Petitioners, v. LILLIAN RECHENMACHER, as County Clerk, etc., Respondent.

Lillian Rechenmacher, in pro. per., for Respondent.

VAN DYKE, J.— Petitioners ask that a writ of mandate be issued, directing the respondent, the County Clerk of the County of Placer, to sign as such official, bonds of the

Auburn Joint Union Elementary School District of Placer County and El Dorado County. It appears from an agreed statement of facts that proceedings have been carried through intended to authorize the issuance and sale of these bonds, but it is claimed by respondent that certain matters occurring during the proceedings have resulted in the invalidity thereof to the extent that the bonds, if issued, would be void. The school district is partly in Placer and partly in El Dorado. Ninety-five per cent is in Placer County. The board of trustees of the district (hereafter called "the trustees") on November 20, 1950, ordered the calling of an election to be held in the district on December 19th following, for the purpose of submitting to the electors thereof the question whether bonds of said district should be issued and sold in the total amount of $210,000. Notice of the election was published in the Auburn Journal, a newspaper printed and published in Placer County. The election was held and resulted in there being cast a total of 895 votes, of which 674 were in favor of issuing the bonds, 212 were against and 9 were cast in blank. More than the necessary two thirds having voted for the issuance of the bonds, the respective boards of supervisors of the two counties adopted orders for the issuance of the bonds.

It appears that there were certain contradictions relative to the total of the bonds proposed to be issued and the schedule of maturities thereof, which developed during the proceedings. As required by the statutes, the trustees fixed the table of maturities so that, disregarding maturities not material here, bonds numbered 131 to 150 would mature in 1963, those numbered 151 to 180 in 1964 and those numbered 181 to 210 in 1965. The published notice of election, while stating that the total bonded debt was to be the sum of $210,000, contained a schedule of maturities differing from that set up by the trustees in these particulars: Bonds numbered 131 to 155 would mature in 1963, those numbered 156 to 185 would mature in 1964 and those numbered 186 to 215 in 1965. No bonds numbered above 210 were provided for in the trustees' order. The total amount of bonds included in the published notice was $5,000 in excess of what the order called for. The notices which were posted were correct and did not contain the error in the published notice. It is stipulated that a great deal of publicity was given to the bond election and a high percentage of votes was cast and there is no indication that there was ever any doubt in fact as to the total amount of bonds which it was proposed to issue. Thus in the issue of the Au-

burn Journal of November 21st, the first issue in which the notice was published, the matter of a bond election was featured in a news story on the front page, the heading in bold type reading: "$210,000 SCHOOL BOND ELECTION DECEMBER 19." And, as we have noted, although the maturity schedule as published listed five too many bonds, so that an elector, adding them, would see that they totaled $5,000 more than $210,000, yet in the forepart of the same notice, in stating the first proposition to appear on the ballot, it was said that it would be whether or not the district would incur a bonded indebtedness in the sum of $210,000. The erroneous table of maturities appeared in the closing part of the notice. This part of the notice first repeated the statement that the bonds proposed to be issued would be $210,000 in aggregate principal amount, which was correct, and then proceeded to set up the erroneous table of maturities which would, in principal amount, aggregate $215,000.

After the election returns were canvassed, the board of supervisors of each of the two counties passed a resolution providing for the issuance of $210,000 worth of bonds. The resolutions provided for the form of the bonds in accordance with the statute. The boards did not fall into the same error which had appeared in the published notice as to the total of bonds to be issued, but nevertheless the schedule of maturities does differ from that contained in the order of the trustees. Where the latter's order called for 20 bonds numbered 131 to 150 to mature May 1, 1963, the boards' schedule of maturities called for 25 bonds numbered 131 to 155 to mature on that date. Where the trustees' order called for 30 bonds numbered 151 to 180 to mature May 1, 1964, the boards' orders called for 30 bonds numbered 156 to 185 to mature on that date, and where the order of the trustees called for 30 bonds numbered 181 to 210 to mature May 1, 1965, the boards' orders called for 25 bonds numbered 186 to 210 to mature on that date. The boards' orders did not order issuance of any bonds numbered above 210. The boards' orders differed from the trustees' order and from the posted notice only in advancing the maturities of five bonds from 1965 to 1963.

The statutory provisions for the issuance of school district bonds are found in division 3, chapter 17, of the Education Code (§§ 7401 to 7595). Section 7401 provides in substance that when in the judgment of the governing board of any school district it is advisable the board shall call an election to submit to the electors of the district the question whether

bonds of the district shall be issued and sold for the purpose of raising money for purposes stated in the section. The action taken by the trustees of the subject district complied with the provisions of this section. Section 7402 provides that the election shall be called by posting notices signed by a majority of the governing board in at least three public places in the district and it is not contended that the trustees did not cause these notices to be properly posted. The section then provides that if there is a newspaper of general circulation published in any county in which any part of the district is situated, the notice shall be published therein at least once in each calendar week for three successive calendar weeks prior to the election. The publication was made in the Auburn Journal and it complied with the section in all particulars except the irregularities hereinbefore stated concerning the maturity and number of the bonds. Section 7403 requires that among other things the notice shall contain the number of years, not exceeding 25, which the whole or any part of the bonds are to run and the posted notice complied with this provision. It was the published notice which in the particulars we have noted varied from the trustees' order and the posted notice. The following sections provide for the conduct of the election, including provisions as to the form of the ballots and declare that the words to appear on the ballots shall be ''Bonds—Yes'' and ''Bonds—No'' and state further that a brief statement of the proposition setting forth the amount of the bonds to be voted upon, the maximum rate of interest and the purposes for which the proceeds of the sale of the bonds are to be used *may* be printed upon the ballot, but that no defect in that statement, other than the statement of the amount of the bonds to be authorized, shall invalidate the bonds. It is not contended that the ballots furnished the electors conflicted in any way with these provisions. Seven days after the election the statute requires the trustees to publicly canvass the returns and this was regularly done. Complying with section 7407 the trustees caused an entry of that fact to be made upon their minutes. The same section provides that the trustees shall then certify to the supervisors ''all proceedings had in the premises.'' It is not contended that these procedural steps were not taken. It is then provided in the same section that ''thereupon the board of supervisors shall issue the bonds of the district *in accordance with the proceedings.*''

Section 7463 declares:

''No error, irregularity, or omission which does not affect

the substantial rights of the taxpayers within the district or the electors voting at any election at which bonds of any district are authorized to be issued shall invalidate the election or any bonds authorized."

The first irregularity consisted of the error made in the published notice with respect to the schedule of maturities and the number and amount of bonds to be issued. When we consider that the trustees' order was regular in all respects, that it and the posted notices alike gave true and full information, that the ballots used at the election likewise informed the electors they were voting Yes or No upon a bond issue to consist of 210 $1,000 bonds, and when we consider further that even the published notice described the bond proposition to be voted on as being for the issuance of these same 210 $1,000 bonds, we feel it must be held that the irregularity noted in the published schedule of maturities did not and could not "affect the substantial rights of the taxpayers within the district or the electors voting at the election authorizing the bonds." We therefore hold that the proceedings were valid up to and including the point where they were certified to the supervisors, and had resulted in an authorization by the electors for the issuance and sale and subsequent payment of bonds of the district, 210 in number of the face value of $1,000 each, and maturing as set forth in the order of the trustees and in the posted notice.

Upon certification of the proceedings to the supervisors it was the duty of those boards to "issue the bonds of the school district in accordance with the proceedings." This the supervisors did not do. They ordered bonds issued in all respects in accordance with the proceedings with the single exception heretofore noted that, with respect to five of the bonds which according to the trustees' order were to mature in 1965, they advanced the maturities by two years, placing them in the number of bonds that were to mature in 1963. We think it cannot be said that by advancing the maturities of these five bonds by two years the boards committed an error which affected the substantial rights of taxpayers or electors. It has been the general rule that errors and irregularities in bond issue proceedings which did not increase or change the burden upon the taxpayers and could not mislead any elector to his prejudice would not invalidate the bonds. (*City of Redding* v. *Holland,* 75 Cal.App.2d 178, 185 [170 P.2d 132]; *City of San Diego* v. *Millan,* 127 Cal.App. 521, 527-528 [16 P.2d 357]. See other cases cited in *City of Redding* v. *Hol-*

*land, supra.*) It might be argued that the irregularity here in changing the maturity dates as indicated would affect the rights of taxpayers and be beyond the scope of the rule pronounced in the cited cases. But the statute here has declared that these irregularities must affect *substantial* rights before the bonds shall be invalidated. And we think the variance here comes within the protection of the statute. This is not to say that such changes could not be momentous enough to exceed the protection of the statute, in which case the bonds would be invalidated. It is only to say that the irregularity here has not reached that result.

■ It is further contended that, since the school district lies in two counties, notice of election should have been posted and published in both counties. We have already quoted section 7402 of the Education Code, which specifies how notice shall be given and we think a reading of that section is an answer to this contention. Notices are to be posted in the district. There is no requirement that they be posted in each county. They were posted in the district and that posting was sufficient. The section further provides for publication in a newspaper if there is one "in any county in which any part of the district is situated." This is not to be read as requiring that the publication be in a newspaper in each county in which a part of the district may lie and we hold that the publication in the Auburn Journal was sufficient. (See *County of Sacramento* v. *Stephens,* 11 Cal.App.2d 110 [53 P.2d 197].)

■ It appearing that there were no errors, irregularities or omissions which affected the substantial rights of taxpayers or electors and that the bonds ordered issued will be valid obligations, it is ordered that the writ prayed for be issued.

Peek, J., and Schottky, J. pro tem., concurred.